UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| WILLIAM V. SCHMITTO, JR. )<br>        Plaintiff, )<br>)<br>v. )<br>)<br>CAROLYN COLVIN,[1] )<br>        Defendant. ) | No. 12 CV 50358<br>Magistrate Judge Iain D. Johnston |

**MEMORANDUM OPINION AND ORDER**

William V. Schmitto, Jr. filed this appeal seeking the reversal of a decision denying him disability benefits. For the reasons given below, the defendant's motion for summary judgment is denied, the plaintiff's motion is granted, and the case is remanded.

**BACKGROUND**

**I.     Procedural History**

Mr. Schmitto filed concurrent applications for disability benefits under Title II (Disability Insurance Benefits or "DIB") and Title XVI (Supplemental Security Income or "SSI") of the Social Security Act ("SSA"), alleging a disability onset date of June 1, 2008, due to a heart condition. R. 135, 175. The applications were denied initially on October 29, 2008, R. 39-40, and on reconsideration on January 26, 2009, R.41-42. Mr. Schmitto filed a timely request for a hearing, which occurred on January 28, 2011. R. 24.

The ALJ issued a decision on May 26, 2011, denying the claims for benefits. R. 10-17. On June 22, 2011, Mr. Schmitto filed a timely request for a review of the ALJ's decision.

---

[1] Pursuant to Federal Rules of Civil Procedure 25(d), we have substituted Carolyn W. Colvin for Michael J. Astrue as the appellee.

R.133-34. On September 11, 2012, the Appeals Council denied the review, making the ALJ's decision the final decision of the Commissioner. R. 1-3. Mr. Schmitto then initiated this appeal. *See* 42 U.S.C. § 405(g).

## II. Hearing Testimony

Mr. Schmitto appeared at the hearing with counsel, and was the only witness who testified. He stated that he completed the eleventh grade, received a driver's license, and previously worked as a mechanic. R. 31. He described his multiple heart attacks for which he received multiple stents and, finally, quadruple bypass surgery in October 2010. R. 31, 33. He also received a pacemaker. R. 35. He testified that he was laid off from his last job before his June 2008 heart attack. R. 30.

Mr. Schmitto stated that before his bypass surgery he experienced a lot of chest discomfort including a burning sensation. R. 34. After his surgery, he testified that he felt a "little wheezy yet but every day gets a little better." R. 33. He stated that he got dizzy when sitting down or standing up too fast and was unable to drive for seven to eight months. R. 36-37. He also testified that he leaves his home two to three times a week only for medical appointments or to accompany his wife shopping. R. 32-33. He stated that other than watching television or building models, his wife "don't let me do anything." R. 32. He testified that walking the fifty to sixty feet to his mailbox takes him four to five minutes and leaves him short-winded, requiring a few minutes' rest before he can return. R. 35-36. He stated that he can walk only fifteen to twenty minutes before needing a break. R. 36.

Mr. Schmitto testified that as of the hearing date, he had not yet participated in any cardiac rehabilitation, and that he had missed a call to set up an appointment. R. 34. He stated that he had received no post-surgery instructions. R. 34.

**III.     Medical Evidence**

The medical evidence presented revealed that Mr. Schmitto suffered four heart attacks. The first occurred in 2002 and was treated by placement of a stent in the left anterior descending coronary artery. R. 422. The second occurred in 2006 and was treated by placement of a stent in his right coronary artery. R. 232. On June 1, 2008, Mr. Schmitto suffered a third heart attack while chopping a downed tree. R. 266. In response, doctors placed another stent in his right coronary artery. R. 301. After he recovered from surgery, his doctors planned to assess whether he had ongoing ischemia and suspected he would eventually need "staged coronary artery bypass grafting." R. 306.

In July 14, 2008, treating cardiologist Dr. Paul Christensen determined that Mr. Schmitto had "[s]evere global functional impairment with ejection fraction 24%." R. 316. On July 25, 2008, Dr. Christensen noted Mr. Schmitto's "ischemic cardiomyopathy, without ongoing ischemia," an ejection fraction of 30%, and although Mr. Schmitto was "asymptomatic with all the activities around his home," recommended that he apply for permanent medical disability. R. 317-20.

On August 18, 2008, Dr. Christensen reported that Mr. Schmitto's ejection fraction was 30%, that he walked one-and-a-half miles without symptoms, but that he got occasional dyspnea[2] if he exercised too much. R. 421.

On October 23, 2008, state agency physician Dr. Charles Kenney completed a residual functional capacity form indicating that Mr. Schmitto could lift up to twenty pounds occasionally, ten pounds frequently, could stand, walk and sit for about six hours in an eight-hour day, with no limitations in pushing or pulling. R. 433.

---

[2] "Dyspnea" means "[s]hortness of breath, a subjective difficulty or distress in breathing, usually associated with disease of the heart or lungs; occurs normally during intense physical exertion or at high altitude." Steadman's Medical Dictionary, 601 (28th ed. 2006).

On November 3, 2008, Dr. Christensen reported that Mr. Schmitto showed improvement and was asymptomatic but that his "ejection refraction was still only around 40%." R. 422.

On January 16, 2009, state agency physician Dr. Frank Jiminez reviewed and affirmed the findings of Dr. Kenney. R. 441.

On April 26, 2010, Dr. Leela Dhanekula reported that Mr. Schmitto had completed twelve minutes of a cardiac stress test on March 25, 2010, and had "excellent exercise capacity," but that his ejection fraction on that date was just 25%. R. 486. She further reported that a subsequent scan on April 1, 2010, revealed an ejection fraction of 24%. *Id.* She recommended that although his heart belonged in New York Heart Association Functional Class 1, his history of three heart attacks and his low ejection fraction made him a "high-risk candidate to have sudden cardiac death episodes." R. 488. Dr. Dhanekula recommended Mr. Schmitto receive a pacemaker, and then installed the pacemaker on May 21, 2010. R. 479-80, 488.

On August 21, 2010, Mr. Schmitto suffered a fourth heart attack after pushing his motorcycle up a hill. R. 472. He had another stent placed in his right coronary artery. R. 469.

On September 13, 2010, and again on December 6, 2010, Mr. Schmitto's ejection fraction was 35%. R. 465, 513 (although both the ALJ and the government stated that Mr. Schmitto's ejection fraction rose to 40% during the latter part of 2010, the medical records they cited either reported an ejection fraction of 35%, R. 513 (the ALJ) or did not report an ejection fraction at all, R. 517 (the government)).

On September 24, 2010, surgeon Dr. David Gable noted Mr. Schmitto's history of heart attacks, his pacemaker, and his most recent ejection fraction of 35%, and that he was scheduled to undergo coronary artery bypass grafting. R. 443. Dr. Gable opined that these conditions left Mr. Schmitto a "cardiac cripple," and he did not believe that "even with maximum medical and

surgical intervention will be able to return to work. I believe he would qualify for disability."
*Id.* Dr. Gable performed the quadruple bypass surgery on October 5, 2010. R. 511.

## IV. The ALJ's Decision

The ALJ found that Mr. Schmitto was insured through September 30, 2008, had not engaged in substantial gainful activity since June 1, 2008, and suffered the severe impairments of heart disease and obesity. R. 12. However, he concluded that the impairments individually or in combination did not meet a Listing, that Mr. Schmitto had the residual functional capacity to perform the full range of sedentary work, and that although he could not perform his past relevant work as a mechanic, material handler, or farm laborer, he could perform a significant number of other available sedentary jobs and, therefore, was not disabled. In making that conclusion, the ALJ did not address Dr. Christiansen's July 25, 2008, recommendation that Mr. Schmitto apply for disability benefits, did not accept Dr. Cable's September 24, 2010, characterization of Mr. Schmitto as a "cardiac cripple," found Mr. Schmitto's testimony about his limited mobility to be "unreliable" because he just "needed time to heal" from his bypass surgery, and apparently accepted the state agency physician's determination that Mr. Schmitto could still work, although the ALJ found he could perform only sedentary rather than light work because of events that post-dated the state agency physicians' determinations, including the subsequent fourth heart attack and quadruple bypass surgery. R. 14-15.

## ANALYSIS

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are

conclusive. *Id.* Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (a "mere scintilla" is not substantial evidence). If the Commissioner's decision lacks evidentiary support or adequate discussion, then the court must remand the matter. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

The plaintiff sets out three arguments that this appeal should be remanded because the ALJ erred. First, the plaintiff argues that the ALJ erred by finding he did not meet a Listing. The ALJ found that the most applicable Listing was 4.02 for chronic heart failure, but concluded that Mr. Schmitto did not meet the Listing. According to the ALJ, although Mr. Schmitto's cardiac ejection rate dipped below 30%, the dip did not occur during a "period of stability," and a claimant must establish both in order to meet the requirements of Part A of the Listing. The plaintiff briefly argues that the ALJ erred because his rate dipped below 30% on three occasions. Memorandum [15] at 3. Perhaps plaintiff's point is that the ALJ failed to support his conclusion that the dips did not occur during periods of stability. But the plaintiff ignores that the ALJ found that Mr. Schmitto also failed to meet the requirements of Part B of Listing 4.02 by presenting evidence that (1) an exercise test would be too risky; (2) an inability to perform an exercise test at 5 METs or less; or (3) three or more separate episodes of congestive heart failure within twelve months. To meet Listing 4.02, a claimant must satisfy both Parts A and B, and the

plaintiff offers no argument as to Part B.  Accordingly, the plaintiff has not established any error in the ALJ's conclusion that Listing 4.02 was not met.

Second, the plaintiff argues that the ALJ erred by failing to properly apply the treating physician rule when evaluating the reports of Dr. Christenson and Dr. Cable.  Under the treating physician rule, a treating physician's opinion is entitled to controlling weight if it is supported by medical findings and consistent with other substantial evidence in the record.  20 C.F.R. § 404.1527(c)(2); *Moore v. Colvin*, 743 F.3d 1118, 1127 (7th Cir. 2014).  If the ALJ does not give the treating physician's opinion controlling weight, the ALJ cannot simply disregard it without further analysis. *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010).  Instead, the ALJ must determine what specific weight, if any, the opinion should be given.  *Moss v. Astrue¸* 555 F.3d 556, 561 (7th Cir. 2009).  To make this determination, the ALJ must apply the checklist of factors set forth in 20 C.F.R. § 404.1527(c)(2).  *Campbell*, 627 F.3d at 308 (referring to the factors as a "required checklist"); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008).  Failure to apply checklist is reversible error.  *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (ALJ disregarded checklist); *Moss*, 555 F.3d at 561 ("the choice to accept one physician's opinions but not the other's was made by the ALJ without any consideration of the factors outlined in the regulations").

Similarly, ALJs commit reversible error by simply stating that they considered the checklist without showing in their decisions that they did, in fact, consider them.  *See Campbell*, 627 F.3d at 308 ("Here, the ALJ's decision indicates that she considered opinion evidence in accordance with [the checklist]. However, the decision does not explicitly address the checklist of factors as applied to the medical opinion evidence."). In other words, ALJs must show their work.

Here, the ALJ did not follow this rule. He did not discuss at all the July 25, 2008, report in which Dr. Christensen noted the following: "I have recommended he apply for permanent medical disability based upon the above information." R. 320. The defendant argues "[a]s the ALJ recognized, Dr. Christensen's opinion was not entitled to controlling weight." Response [22] at 8. Yet the ALJ never made that determination. Although the ALJ relied on Dr. Christensen's notes from August and November 2008 that Mr. Schmitto exercised daily without symptoms, including walking one-and-a-half miles a day, R. 420-21, he never addressed Dr. Christensen's report from shortly before when, in July 2008, he noted that all of the medical conditions identified in that report may have left Mr. Schmitto unable to ever work again, R. 320. The defendant argues that the ALJ was entitled to disregard Dr. Christensen's July 2008 notation because it "sheds no light on what functioning Schmitto can or cannot perform" and "is the exact type of opinion the ALJ need not accept." Response [22] at 9. But the ALJ needed to provide that reasoning after first weighing the report and then explain his reasons for disregarding it---the government may not supply the missing analysis for the first time on appeal. *See Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) ("[T]he *Chenery* doctrine ... forbids an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced.").

The plaintiff argues that the ALJ also erred by failing to properly weigh Dr. Cable's September 24, 2010 report, in which Dr. Cable referred to Mr. Schmitto as a "cardiac cripple." R. 443. The ALJ stated that Dr. Cable's report "is not accepted" because "I do not know what Dr. Cable means by 'cripple'," because Dr. Cable "did not cite specific work-related restrictions of limitations," and because Dr. Cable's opinion that Mr. Schmitto would not be able to return to work and "would qualify for disability" was vague, may have been referring only to past work as a mechanic, and was on an issue reserved to the Commissioner. R. 15.

To begin, the ALJ did not address whether he considered Dr. Cable a treating physician or evaluate any of the factors set out in the regulations needed to determine the weight to give the doctor's report. In its brief, the government for the first time gives reasons why Dr. Cable is not a treating physician, Response [22] at 9, but the government may not supplement the ALJ's analysis on appeal. *Parker*, 597 F.3d at 922. Curiously the government also states that "[a]s "Schmitto recognizes, Dr. Cable was not a treating physician," Response [22] at 9, despite Mr. Schmitto's assertion in his opening brief that "[b]oth Dr. Christensen and Dr. Cable are treating sources," Memorandum [15] at 1.

Second, "the law of this Circuit requires ALJs to communicate with a claimant's treating physician for clarification when that physician has offered an ambiguous opinion directly addressing questions reserved for the Commissioner, such as whether the claimant is disabled." *Griffin v. Colvin*, 14 CV 1182, 2014 WL 5461796, at *3 (N.D. Ill. Oct. 28, 2014). The ALJ found Dr. Cable's opinion to be ambiguous and on an issue reserved to the Commissioner, but he never contacted Dr. Cable for additional information. Instead, the ALJ used those as reasons to reject the opinions rather than clarify them.

Finally, the plaintiff argues that the ALJ erred by finding his testimony about the intensity, persistence and limiting effects of his conditions to be "unreliable." R. 14. The ALJ found that Mr. Schmitto's testimony at his January 28, 2011, hearing that he still felt wheezy, short of breath and dizzy on occasion, and that he had trouble walking fifty to sixty feet to his mailbox and could stand at the mailbox only a second or two, did not establish limitations that would "persist for any significant length of time." R. 14-15. The reasons given for that conclusion were that Mr. Schmitto just "needed time to heal" from his quadruple bypass, had not yet begun cardiac rehabilitation, and admitted that every day he gets a little better. R. 14-15.

The ALJ also relied on reports from late 2008 that Mr. Schmitto could walk one-and-a-half miles daily and from May 2010 that he ran for twelve minutes without incident as part of a stress test as further evidence that any limitations were not persistent, and discounted that these abilities were followed by yet another heart attack in August 2010 because, at the time, Mr. Schmitto was pushing a motorcycle up a hill, which the ALJ noted based on personal experience was a "heavy and difficult" task even on level ground. R. 15.

The ALJ cited no medical evidence to support his conclusion that the symptoms Mr. Schmitto described during his hearing would subsist in time or that his fourth heart attack in 2010 was evidence only that he could not perform heavy as opposed to sedentary work. Instead, the ALJ based his conclusions on personal experience and speculation. An ALJ may not play doctor. *McKinney v. Colvin*, No. 13 CV 2054, 2014 WL 7332831, at *3 (N.D. Ill. Dec. 22, 2014) (ALJ erred by casting aside medical opinions about claimant's impairments and substituting his own conclusions based on progress notes such as "much improved"). By not linking his conclusions about Mr. Schmitto's abilities to medical evidence, the ALJ failed to establish a logical bridge between the evidence and his decision that Mr. Schmitto's testimony about his limitations was unreliable. *See Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir.2008) (the ALJ must build an accurate and logical bridge from the evidence to the conclusion). Accordingly, in this additional manner, the ALJ erred.

## CONCLUSION

Because the ALJ did not sufficiently explain his weighing of medical evidence and did not properly assess the claimant's testimony about his limitations, the plaintiff's motion for

summary judgment is granted, the government's motion for summary judgment is denied, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

Date: January 7, 2015      By: _____
                                                    Iain D. Johnston
                                                    United States Magistrate Judge